198 So. 357

**JOHNSON v. JOHNS SERVICE FUNERAL PARLOR, Inc., et al.**

**6 Div. 671.**

Supreme Court of Alabama.

Oct. 17, 1940.

Rehearing Denied Nov. 14, 1940.

Harsh, Harsh & Hare, of Birmingham, for appellant.

Taylor & Higgins, of Birmingham, for appellees.

BROWN, Justice.

Action on the case by the servant against the master to recover damages for personal injuries received in the service or business of the master. Counts one and three of the complaint are predicated on the provisions respectively of Subdivision two and one of the Employers' Liability Act, Code 1923, § 7598. Count two charges a violation of the duty imposed by the common law, on the master to furnish the servant a safe place to perform his work. Gentry v. Swann Chemical Co., 234 Ala. 313, 174 So. 530; Langhorne et al. v. Simington, 188 Ala. 337, 66 So. 85.

The pleas were the general issue, pleaded in short by consent with leave to give in evidence matters that would constitute a defense in bar if specially pleaded.

At the conclusion of the evidence the court, at the instance of the defendants, directed a verdict for them by giving the written specially requested affirmative charge.

For the purpose of the appeal it is conceded, and correctly we think, that there was evidence which tended to support counts one and three of the complaint. The verdict was directed by the circuit court on the theory that the undisputed evidence shows that plaintiff was guilty of negligence which proximately contributed to his injuries.

The plaintiff received his injuries by falling in the well of the freight elevator from the first floor of the building to the basement, some fourteen or fifteen feet, while in the act of carrying a vacuum cleaner and equipment from the garage back of the defendants' funeral parlor to the second story of the building, as he had been directed to do by the person in charge and exercising superintendence over the business of the defendant Johns Service Funeral Parlor, Inc.

The evidence bearing on the question of contributory negligence, to state it most favorably to plaintiff, tended to show that the elevator was located in the rear of the building and the first floor of the building was lighted by such daylight as was shed through the back door, and a window in the rear, both covered by a shed or porte-cochere where the hearse and automobiles approached the parlor, and two electric lights in the main building. On the day of the injury the light nearest to the elevator was out of order, a fact which had been called to the attention of the manager or superintendent by plaintiff and he had promised to repair same. The day was darkened by a rain-storm, in consequence of which the rear of the first floor and the elevator were in semi-darkness.

The elevator was hand-operated by pulling a rope over large pulleys located in the top of the well, and was counterbalanced by heavy weights; it was equipped with brakes, and as designed and originally constructed, was also equipped with an automatic gate which closed the well when the elevator was operated and left the floor. This gate at the time of the injury and all during plaintiff's service was out of order and had to be released by hand. The counterbalance weights so lightened the elevator that if the brake released it would move without human intervention to the second floor, leaving the gate up and the entrance to the elevator well open and unprotected.

The elevator was used principally to carry caskets to and from the respective floors of the parlor, and it was part of plaintiff's duties to operate the elevator for that purpose and for moving equipment used in the business.

A few minutes before the plaintiff fell to his hurt he passed the elevator on which was loaded a casket to be carried to the second floor, and saw the elevator so standing and loaded on the first floor. He then went on the outside of the building to the garage, picked up the vacuum cleaner and its equipment and returned to the main building on his way to the elevator to place the vacuum cleaner thereon, to be carried with said casket to the second floor. In the meantime some one had lifted the elevator from the first to the second floor without closing the gate, or the brakes had been released and it had moved to the second floor without tripping the defective gate so as to close the well entrance.

The plaintiff testified on direct examination: "You ask me to tell the jury what happened immediately before that with reference to the vacuum cleaner. I was given orders to take it upstairs, and I went to get it to take it upstairs. I went to get it to take it upstairs, yes sir. I got it out in the garage. When I got the vacuum cleaner, I had left the hall, a casket was on the elevator and it was my duty to take it up too. The elevator was in place. It was my duty to take the casket to the second floor. There was a casket room on the second floor, and the elevator was in place, and the door was up then when I left there. The elevator was in place, that is on a level with the first floor. That is the floor I fell from. The elevator was in place and the casket was on the elevator and the door was up. I saw it in that condition myself. I did not use the elevator that morning myself before that. I did not get to use it. I was intending to do it. The weather was cloudy at the time I came back to the elevator entrance with the vacuum cleaner. In the hall it was very dark always, and on this morning it was dark. When I came back with the vacuum cleaner, it was slightly dark, but it was getting darker. When I came back with the vacuum cleaner I had it on my shoulder and the other utensils and things were in my left hand. It was a Hoover Vacuum Cleaner, according to my recollection, either a Hoover or a Duplex. It had a couple of contraptions you put on it and I had them in my hand and the machine was on my shoulder. It had utensils and was shaped kinder broom-like when you connected it up and you had it on rugs and things. I don't know whether it was a Duplex or a Hoover, but it was a vacuum cleaner. I had part of it on my shoulder and the equipment in my hands. When I came in the back hall the electric light there by the elevator was not burning. It was dark in the back hall. The door was closed. I could open the door coming in with the hand I had the equipment in. The elevator door was up when I came back. You ask me to tell the jury what happened after I got in the hall and I answer the elevator had done gone. I was so sure the elevator was there, I knew I left the casket, and I intended to take the casket— I had left the elevator in place and I was due to get off in fifteen minutes' time and I was trying to get my work completed. I had still some to do, and I was trying to complete the work so I could get off, in particularly on the 4th. I always got off. I went and got the vacuum cleaner, and I walked right off into the shaft. You ask me if I was looking in front of me, and I answer well it was dark, the best I could look. I knew the elevator was there, and I could not look down, and the door was up there, and I had this on my shoulder. I did look the best I could. I was not drinking or drunk and had not had anything to drink. I did not see that the elevator was not there. I fell down the elevator shaft, to the basement floor across the concrete sill."

On cross-examination plaintiff testified: "I walked over there and opened the door with my left hand and walked in the back hallway with the vacuum cleaner on my right shoulder. Then I turned around and closed the door, I think I took my foot and

closed it. You ask me if I took time to notice whether the dark brown lattice gate was up, to see if it was in that position, and I answer 'yes sir'. You ask if I took time to notice in front of the window a dark brown screen was folded up lying against the window and I answer: 'I left the screen there myself.' I saw it there before I went to the elevator shaft. You ask me 'And you were so sure the elevator was in place you did not look at the elevator, did you?' and I answer that is true. You ask: 'Then you did not look for the elevator did you'? and I answer, 'I sure didn't.' You ask me if after stopping and closing the doors and after looking at the dark brown lattice gate and seeing it was up and after looking at the dark brown folded screen and seeing it was lying there where I had left it, I came and walked right to the elevator shaft without looking to see whether or not the elevator was there, and I answer I could not look down. You ask me if I did or not and I answer 'yes sir', I walked right into the shaft. You ask me if I walked right on without looking to see whether or not the elevator was there, and I answer 'yes sir.'"

On redirect examination plaintiff testified: "After I shut the door to the porch I turned and walked *stright* into the hall. I was looking the way I was going, looking up here, I had my head up. My eyes were out in front of me, the direction I was going. I could not see the elevator while I was looking that way."

The only persons in the building at the time who had access to the elevator were Mr. Johns, the directing head of the business, and the witness Burns, both familiar with the condition of the elevator, its defects and modus operandi, and we think the plaintiff had the right to assume that if either moved the elevator they would have observed the procedure of closing the gate. There is no affirmative evidence that plaintiff knew that the brakes on the elevator were so defective that they would release their hold so that the elevator would move without human intervention.

The evidence is clear to the point, and without dispute, that plaintiff did not know that the elevator, in the few minutes he was out procuring the vacuum cleaner, had moved or been removed from the first to the second floor, leaving the well a veritable trap, unprotected by the gate.

In Garing v. Boynton et al., 224 Ala. 22, 138 So. 279, "A gray horse case", after full consideration we held that the question of contributory negligence rested on inference which it was the province of the jury to draw.

 On the authority of that case we hold that the court erred in directing a verdict for the defendants.

If the plaintiff had known that the elevator well was open and unguarded presenting a case of open, obvious danger, the authorities cited by the appellee would be apt and controlling.

 The other questions argued may not arise on another trial, but evidence as to the method of the elevator's use by the defendants and its employees, and the precautions taken to prevent injury, were well within the issue.

For the error noted, the judgment is reversed.

Reversed and remanded.

GARDNER, C. J., and THOMAS and KNIGHT, JJ., concur.